Slip Op. 08-78

# UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                          :
A.D. SUTTON & SONS,                       :
                                          :
      Plaintiff,                        :
                                          :
      v.                                : Before: Jane A. Restani, Chief Judge
                                          :
UNITED STATES,                            : Court No. 03-00510
                                          :
      Defendant.                        :
_____:

## OPINION

[Motion and cross-motion for summary judgment denied.]

Dated: July 16, 2008

    Serko Simon Gluck & Kane LLP (Joel K. Simon and Robert D. DeCamp) for the plaintiff.

    Gregory G. Katsas, Acting Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Gardner B. Miller and Marcella Powell); Yelena Slepak, Office of Assistant Chief Counsel, International Trade Litigation, Bureau of Customs and Border Protection, U.S. Department of Homeland Security, of counsel, for the defendant.

    Restani, Chief Judge:  This matter is before the court on cross-motions for summary judgment by plaintiff A.D. Sutton & Sons ("A.D. Sutton") and defendant United States ("the Government").[1]  A.D. Sutton challenges the classification for tariff purposes of its imported merchandise, bags that it claims are used to store baby food and beverages.  The United States Bureau of Customs and Border Protection ("Customs") classified the bags under the Harmonized

---

[1] This case is designated a test case.  (Order Granting Mot. for Test Case Designation (Nov. 4, 2004).)

Court No. 03-00510											Page 2

Tariff Schedule of the United States (1998) ("HTSUS") subheading 4202.92.45 as other "[t]ravel, sports and similar bags" at 20% <u>ad valorem</u>.[2]  A.D. Sutton contends that the bags should be classified under subheading 3924.10.50 as other plastic "[t]ableware and kitchenware" at 3.4% <u>ad valorem</u>.[3]  Because a genuine issue of material fact exists as to the principal use of the bags, the motions for summary judgment will be denied.

---

[2] Subheading 4202.92.45 reads as follows:

| | |
|---|---|
| 4202 | Trunks, suitcases, vanity cases, attache cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; traveling bags, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber, or of paperboard, or wholly or mainly covered with such materials or with paper: |

. . .
        Other:
. . .
4202.92			With outer surface of sheeting of plastic or of textile materials:
            Travel, sports and similar bags:
. . .
4202.92.45					Other.

[3] Subheading 3924.10.50 reads as follows:

3924			Tableware, kitchenware, other household articles and toilet articles, of plastics:
3924.10			Tableware and kitchenware:
. . .
3924.10.50				Other.

## BACKGROUND

The bags at issue entered through the Port of Newark in 1997 and 1998 and were liquidated in 1998 and 1999. (Gov't's Resp. to A.D. Sutton's Statement of Material Facts Not in Issue ¶¶ 7–8.) The parties agree that the bags are approximately 11" high x 9" wide x 5" deep, that they are constructed of an outer and inner layer of plastic, and that some of the bags contain a middle layer of foam approximately three millimeters thick. (Id. at ¶ 13.) The parties also agree that the bags consist of a 495-cubic-inch compartment secured by a zipper or velcro mechanism, and have carrying straps and two internal elastic loops. (Id. at ¶ 14; Mem. in Opp'n to Pl.'s Mot. for Summ. J. & in Supp. of Def.'s Cross-Mot. for Summ. J. ("Def.'s Opp'n & Cross-Mot. for Summ. J.") 15.) A.D. Sutton refers to the bags as "insulated soft-sided coolers" or "bottle bags" and claims that they are "used to store and transport infants' food and beverages over short periods of time." (Gov't's Resp. to A.D. Sutton's Statement of Material Facts Not in Issue ¶ 10; Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 1.) It contends that the "specific design of the two layers of [plastic] sheeting enclosing cell foam plastic insulation allows for storage and transportation of food at or near desired temperatures for a reasonable amount of time." (Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. (May 11, 2007) ("Pl.'s Mot. for Summ. J.") 5.)

Customs initially classified the bags as part of a set under HTSUS subheading 4202.92.45, as they were imported as part of "3-in-1" and "5-in-1" diaper bag sets. (Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts ¶ 1; Answer to Compl. ¶ 6.) A.D. Sutton commenced this action to challenge the set determination, arguing that the bags should be classified individually and under subheading 3924.10.50. (Compl. ¶¶ 41–44.) After A.D. Sutton

Court No. 03-00510                                                                                                   Page 4

filed a motion for summary judgment, the Government conceded the set issue and moved to stay the action to conduct additional discovery to determine whether the bags were properly classifiable under heading 4202 or heading 3924.  (Order Granting Mot. to Stay (Dec. 15, 2006); Consent Mot. to Stay; Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. (Sept. 29, 2006) ("First Summ. J. Mot."), Ex. A to Def's Opp'n & Cross-Mot. for Summ. J.)  While the action was stayed, Customs tested samples of the bags to determine their insulative properties.  (Joint Status Report.)  Based on the test results, Customs concluded that the bags' foam layer possesses no insulative properties and therefore could not effectively maintain food and beverage temperature, and classified the bags under subheading 4202.92.45.  (Id.; Def.'s Statement of Undisputed Material Facts ¶¶ 6–7.)

A.D. Sutton withdrew its prior summary judgment motion and filed the present motion, adhering to its claim that the bags should be classified under subheading 3924.10.50. (Withdrawal of Mot. for Summ. J.; see generally Pl.'s Mot. for Summ. J.)  The Government cross-moved for summary judgment, urging the court to sustain its classification.  (See generally Def.'s Opp'n & Cross-Mot. for Summ. J.)

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(a) in this action to contest the denial of timely protests filed under Section 515 of the Tariff Act of 1930.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  USCIT R. 56(c).

Determining the proper classification of imported merchandise involves a two step analysis: "(1) ascertaining the proper meaning of specific terms in the tariff provision; and (2) determining whether the merchandise at issue comes within the description of such terms as properly construed." Pillowtex Corp. v. United States, 171 F.3d 1370, 1373 (Fed. Cir. 1999) (citing Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998)). The first step is a question of law, and the second is a question of fact. Id. Both are decided de novo here. 28 U.S.C. § 2640(a)(1); Cargill, Inc. v. United States, 318 F. Supp. 2d 1279, 1287 (CIT 2004). Customs' classification of imported merchandise is presumed to be correct under 28 U.S.C. § 2639(a)(1). This presumption of correctness attaches only to factual determinations. Universal Elecs. Inc. v. United States, 112 F.3d 488, 492 (Fed. Cir. 1997). An importer challenging the decision has the burden of overcoming the presumption. 28 U.S.C. § 2639(a)(1).

## DISCUSSION

### I

Preliminarily, A.D. Sutton contends that the Government's prior stipulations that similar bags were classifiable under subheading 3924.10.50 preclude the Government from now arguing otherwise. (Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. & Pl.'s Reply ("Pl.'s Resp. & Reply") 8–9.) This argument lacks merit. In classification cases, "[e]ach new entry is a new classification," and res judicata does not apply to bar successive litigation over the classification of subsequent similar imported merchandise, even if it involves the same issues of fact and questions of law. Aves. in Leather, Inc. v. United States, 317 F.3d 1399, 1403 (Fed. Cir. 2003) (citing United States v. Stone & Downer Co., 274 U.S. 225 (1927)).

### II

To determine the proper classification of imported merchandise, the court looks to the General Rules of Interpretation ("GRIs") of the HTSUS. Orlando Food Corp. v. United States, 140 F.3d 1437, 1439 (Fed. Cir. 1998). The GRIs set forth the order in which the elements of classification are considered. Pillowtex Corp., 171 F.3d at 1374. Under GRI 1, the Court must first construe the language of the heading as well as relative section or chapter notes to determine whether the product at issue is classifiable under that heading. Orlando Food Corp, 140 F.3d at 1440. The court may refer to subsequent GRI provisions only where the headings and notes do not require a particular classification. GRI 1; Pillowtex Corp., 171 F.3d at 1374. Only after the court determines that the merchandise is classifiable under a particular heading should it then look to the subheadings to find the correct classification. Orlando Food Corp., 140 F.3d at 1440.

Note 2(ij) to Chapter 39 provides that the chapter "does not cover . . . trunks, suitcases, handbags or other containers of heading 4202." Note 2(ij) to Chapter 39, HTSUS. Thus, the court must first determine whether the bags are prima facie classifiable under heading 4202. See Midwest of Cannon Falls, Inc. v. United States, 122 F.3d 1423, 1429 (Fed. Cir. 1997). If the court so concludes, the bags are precluded from classification under heading 3924.

Heading 4202 is organized as a list of exemplars followed by the general term "similar containers." The Government argues that the bags are classifiable under heading 4202 because they are encompassed by the listed exemplars "traveling bags" and "bottle cases" or, alternatively, by the general term "similar containers." (Def.'s Opp'n & Cross-Mot. for Summ. J. 10–13.) Heading 4202 is an eo nomine provision, as it describes the merchandise by name. Carl Zeiss, Inc. v. United States, 195 F.3d 1375, 1379 (Fed. Cir. 1999). An eo nomine

Court No. 03-00510                                                                                      Page 7

designation ordinarily includes all forms of the named item.  Id.  The Government claims that, given its common meaning, "traveling bags" encompasses "all forms of flexible containers accompanying a traveler that may be closed for holding, storing, or carrying something."  (Def.'s Opp'n & Cross-Mot. for Summ. J. 12.)  Applying the same analysis to "bottle cases," the Government also claims, the term encompasses "all forms of decorative or protective containers for bottles."  (Id. at 13.)

       In classification cases, "[w]hen a list of items is followed by a general word or phrase, the rule of ejusdem generis is used to determine the scope of the general word or phrase." Aves. in Leather, Inc. v. United States, 178 F.3d 1241, 1244 (Fed. Cir. 1999).  Under the rule, "the general word or phrase is held to refer to things of the same kind as those specified." Sports Graphics, Inc. v. United States, 24 F.3d 1390, 1392 (Fed. Cir. 1994).  Thus, to fall within the scope of the general term, the imported good "must possess the same essential characteristics or purposes that unite the listed examples preceding the general term or phrase."  Aves. in Leather, 178 F.3d at 1244.  It is established that the exemplars in heading 4202 possess "the essential characteristics of organizing, storing, protecting, and carrying various items." Totes, Inc. v. United States, 69 F.3d 495, 498 (Fed. Cir. 1995).  Applying the general rules of classification, because the bags here are used to organize, store, protect, and carry items, they would appear to be similar to "traveling bags" and "bottle cases," exemplars in heading 4204, and thus prima facie classifiable under heading 4202, and simultaneously excluded from classification under heading 3924.  Ordinarily, this would end the matter, however, as will be explained, it does not.

       The court is not writing on a clean slate here.  The Federal Circuit, in SGI, Inc. v.

Court No. 03-00510                                                                                              Page 8

United States, 122 F.3d 1468 (Fed. Cir. 1997), held that imported merchandise possessing the primary purpose of storing food and beverages are properly classifiable under heading 3924 and are not classifiable under heading 4202. Bound by the holding in SGI, the court must classify the bags under heading 3924 if their primary use is to store food or beverages, even if the bags appear to be similar to the exemplars listed in heading 4202.[4] Thus, applying this precedent, the

---

[4] Since SGI was decided, by Presidential Proclamation, the term "insulated food or beverage bags" was added to the list of exemplars in heading 4202, in response to amendments to the International Convention on the Harmonized Commodity and Description and Coding System. Proclamation 7515, 66 Fed. Reg. 66,549, 66,619 (Dec. 18, 2001), as corrected by Technical Corrections to the Harmonized Tariff Schedule of the United States, 67 Fed. Reg. 2008 (Jan. 15, 2002); U.S. International Trade Commission, Publication 3430, Proposed Modifications to the Harmonized Tariff Schedule of the United States, Investigation No. 1205-5 (Final) 4 (June 2001). The modified provision reads:

| | |
|---|---|
| 4202 | Trunks, suitcases, vanity cases, attache cases, briefcases, school satchels, spectacle cases, binocular cases, camera cases, musical instrument cases, gun cases, holsters and similar containers; traveling bags, <u>insulated food or beverage bags</u>, toiletry bags, knapsacks and backpacks, handbags, shopping bags, wallets, purses, map cases, cigarette cases, tobacco pouches, tool bags, sports bags, bottle cases, jewelry boxes, powder cases, cutlery cases and similar containers, of leather or of composition leather, of sheeting of plastics, of textile materials, of vulcanized fiber, or of paperboard, or wholly or mainly covered with such materials or with paper. |
| . . . | |
| | Other: |
| . . . | |
| 4202.92 | With outer surface of sheeting of plastic or of textile materials: |
| |     Insulated food or beverage bags: |
| . . . | |
| 4202.92.05 |         With outer surface of textile materials |
| . . . | |
| 4202.92.10 |         Other. |

HTSUS (2002) (emphasis added). The amendment, however, applies to imported merchandise
                                                                                                        (continued...)

Court No. 03-00510 Page 9

court must now determine the principal use of the bags.

**III**

A.D. Sutton claims the bags are insulated "soft-sided coolers" used to store and transport baby food and beverages.  (Pl.'s Mot. for Summ. J. 5–6.)  In support, it submitted an affidavit and deposition of its president, David Sutton, and a sample of the bag.

Sutton's affidavit focuses on the factors, outlined in United States v. Carborundum Co., 536 F.2d 373, 377 (C.C.P.A. 1976), that the court considers in determining the principal use of an imported merchandise.[5]  Sutton stated that the bags are "principally sold wherever infant and toddler products are sold"; "marketed, designed and primarily used by the ultimate consumer (usually a parent) to carry baby bottles, jars of baby food, 'sipee' cups for toddlers, and other feeding items for toddlers and infants"; expected by "the ultimate purchaser . . . to store and transport an infant's food and beverage at a desired temperature while going on short trips"; and recognized by the "infant accessories trade" that their predominant use "is for storage and containment of food and beverages."  (Aff. of David Sutton (May 11, 2007) ("Sutton

---

[4](...continued)
entered on or after January 1, 2002.  66 Fed. Reg. at 66,553.  Because the bags were entered prior to that date, the modification is inapplicable in this case, and the court must apply the applicable duty rate at the time of entry.  See 19 C.F.R. § 141.69.  Of course, for the future, the issue is resolved in the manner asserted by the Government here.

[5] The factors are "[1] the general physical characteristics of the merchandise, [2] the expectation of the ultimate purchasers, [3] the channels, class or kind of trade in which the merchandise moves, [4] the environment of the sale (i.e., accompanying accessories and the manner in which the merchandise is advertised and displayed), [5] the use, if any, in the same manner as the merchandise which defines the class, [6] the economic practicality of so using the import, and [7] the recognition in the trade of this use."  Carborundum, 536 F.2d at 377 (internal citations omitted).

Court No. 03-00510 Page 10

Aff.") ¶¶ 5–7, 14, Ex. 2 to Pl.'s Mot. for Summ. J.)  Sutton also stated that "[t]he zippered or velcroed closure helps enclose food or beverage"; "[t]he interior elastic loops are conducive to keeping bottles and jars of various sizes in an upright position"; "[t]he interior plastic lining allows for easy clean-up of spilled food and beverage"; and the "plastic cell foam insulation . . . allow[s] for thermal regulation." (Id. at ¶¶ 8–10.) Attached to the affidavit are purchase orders from 1997 through 2000 containing descriptions and drawings of the bags, identified as "bottle bags," and other imported bags. (See Purchase Orders, Attach. to Sutton Aff.)

The Government contends that the affidavit is conclusory in nature and defective because Sutton provided "no foundation, documentation, or explanation as to how he is qualified to make any of the statements made in the affidavit." (Def.'s Opp'n & Cross-Mot. for Summ. J. 16.) These objections are unavailing.

Under USCIT R. 56, affidavits are sufficient to support a summary judgment motion if they are "made on personal knowledge, . . . set forth such facts as would be admissible in evidence, and . . . show affirmatively that the affiant is competent to testify to the matters stated therein." USCIT R. 56(e). The court recognizes that importers "have every incentive for knowing the uses to which their goods are or may be put" and that "executives concerned with designing, framing specifications, ordering, importing, selling, distributing, and promoting an article have to know its chief uses and are competent to testify about them." Dolly, 293 F. Supp. 2d at 1350 (quoting Novelty Import Co., v. United States, 285 F. Supp. 160, 165–66 (Cust. Ct. 1968)). Sutton worked for the company for thirty-one years and has been its president for eighteen years. (Sutton Aff. ¶ 1; Sutton Dep. 51:6–15 (May 17, 2006), Ex. D to Def.'s Opp'n & Cross-Mot. for Summ. J.)  Thus, he is presumed to have personal knowledge of, and would be

Court No. 03-00510 Page 11

competent to testify about, the bags' chief use. In any event, his deposition and other record evidence are sufficient to support A.D. Sutton's motion. See USCIT R. 56(c) (summary judgment may be granted on the "pleadings, depositions, answers to interrogatories, and admissions on file").

During his deposition, Sutton testified that the bags are insulated and are primarily used "[t]o carry a bottle" and "to keep food at a certain temperature." (Sutton Dep. 25:11–19, 41:17–42:1, 42:21–23, 54:4–7, Ex. 3 to Pl.'s Mot. for Summ. J.) Further, in its interrogatory responses, A.D. Sutton stated that "[t]he insulated Bottle Bag is designed for, and dedicated to be used to keep an infant's or toddler's food and drink at an optimal temperature over an extended period of time while keeping the food and drink protected from undesirable external environmental factors." (Pl.'s Resp. to Def.'s First Interrogs. & First Reqs. for Prod. of Docs. & Things ("Interrogatories") 12, Ex. F to Def.'s Opp'n & Cross-Mot. for Summ. J.) A.D. Sutton also distinguished the bags from the diaper bags that were sold with the bags by stating that the diaper bags were not intended to be used to carry food or beverages because of "the availability of specialized insulated Bottle Bags . . . specifically designed and marketed for carrying baby's bottles, food, and beverages." (Id. at 16.) This evidence, if unrebutted, is sufficient to support summary judgment for plaintiff under the principles of SGI.

## IV

The Government argues that the bags are not capable of insulating and therefore could not be used to contain food or beverages at a certain temperature.[6] (Def.'s Opp'n & Cross-

---

[6] A.D. Sutton argues that capability or adequacy is not controlling of use. This argument
(continued...)

Mot. for Summ. J. 15.) In support, it submitted the laboratory reports of the tests that Customs performed on the bags, which concluded that the foam middle layer provide no insulative properties. (Laboratory Report 1 (Jan. 18, 2007) ("First Lab Report") & Laboratory Report 3 (Feb. 5, 2007) ("Second Lab Report") (collectively "Lab Reports"), Ex. C to Def.'s Opp'n & Cross-Mot. for Summ. J.) The First Lab Report contains the results of a first set of tests, and the Second Lab Report contains results from a second set of tests. (See generally Lab Reports.) Accompanying the Reports is a declaration of the Assistant Laboratory Director who supervised the second set of tests, concluding that "the foam middle layer does not provide insulating properties to the []bags, and the []bags are not suited for maintaining the desired temperature of food or drinks for an extended period of time." (Decl. of Harold Katcher ("Katcher Decl.") ¶ 14, Ex. C to Def.'s Opp'n & Cross-Mot. for Summ. J.) The declaration discusses only the results detailed in the Second Lab Report.

      A.D. Sutton claims the second set of tests is technically flawed because the tests deviated from the "cold milk bottle test" performed in Dolly, Inc. v. United States, 293

---

⁶(...continued)
is somewhat inconsistent with its position that the insulative capability of the bags distinguishes them from other bags and renders them appropriate for carrying food and beverages. (See First Summ. J. Mot. 28; Interrogatories at 16.)
    Insulation generally is not determinative of whether a merchandise is used to store food or beverages, but is merely evidence of such use. See Sports Graphics, Inc. v. United States, 806 F. Supp. 268, 273 (CIT 1992) ("Although insulation is not a requirement . . . [it] is indicative of an ability to store food and beverages"), aff'd 24 F.3d at 1390. But here, determination of the bags' use depends on their ability, or, at least, perceived ability to maintain the temperature of food or beverages. Thus, whether the bags provide useful insulation is a material fact.

Court No. 03-00510                                                                                    Page 13

F. Supp. 2d 1340 (CIT 2003).[7] (Pl.'s Resp. & Reply 13–18.) Although the tests performed in this case were different from the one in Dolly, there is no authority establishing that the Dolly test is the legally-accepted test to measure the insulative properties of imported merchandise for classification purposes. The test performed in Dolly was merely an ad hoc test conducted in the courtroom during trial proceedings. Dolly, 293 F. Supp. 2d at 1347 n.4. Furthermore, despite its complaints about Customs' tests, rather than conduct its own Dolly test, A.D. Sutton claims that Customs' test results actually support its position that the bags possess insulative capabilities. A.D. Sutton submitted a report from its own expert which states that the test results show that the bags actually decrease the rate of temperature change. (Technical Review of Laboratory Procedure for Testing Food & Beverage Tote Bags for Their Insulating Properties: The Dolly Test & the Cold Milk Bottle Test ("Crain Report") 14–15, Ex. 12 to Pl.'s Resp. & Reply.) The data relied upon in that report, however, is inconsistent with that in the Lab Reports, and A.D. Sutton does not explain where the data was obtained. (Compare Crain Report 14–15 with Second Lab Report.)

---

[7] The Dolly test entailed placing a bottle of milk in the subject bag there, leaving another bottle in open air, and measuring the temperature of the milk after fifty minutes. Dolly, 293 F. Supp. 2d at 1347 n.4. The Dolly court found that the bag possessed some insulative properties because there was an 8.4 degree difference between the milk in the bag and the milk exposed to open air. Id. The tests here entailed placing a bottle of milk inside a sample of the bags, a similar bag without the foam layer, and a brown paper bag, and recording the temperatures at certain intervals over the course of four hours. (Katcher Decl. ¶ 6; Second Lab Report.) Customs also compared the insulative capabilities of the bags at issue with and without the foam layer. (Katcher Decl. ¶ 6.) In Dolly, each bottle had a thermometer attached to it, but it is unclear here whether thermometers were attached to the bottles or whether the bags were opened to obtain the temperature readings. (Pl.'s Resp. & Reply 12 n.6.) While both bottles in Dolly had the same initial temperature readings, the initial temperature reading for each bottle here was slightly different. (Second Lab Report.)

Court No. 03-00510        Page 14

A.D. Sutton also claims that the Government skewed the evidence by giving little weight to the first set of tests.[8] (Pl.'s Resp. & Reply 11.) A.D. Sutton points out that the Government submitted the First Lab Report without also submitting the accompanying Laboratory Analytical Summary Sheet ("Summary Sheet"), which set forth the details of the tests and the test results.[9] (Id.) A.D. Sutton claims that those results support its position because the tests described in the Summary Sheet are more analogous to the Dolly test, and that the one conforming most strongly with the Dolly test shows a 7.3 degree difference between the milk in the bag and the milk left in open air. (Id. at 11–13.) Although this test conforms to the Dolly test and demonstrates insulative capabilities, the bag used was not one of the bags at issue, but was a sample of a similar bag with a five-millimeter foam layer that A.D. Sutton submitted in connection with a previously stipulated case. (Katcher Decl. ¶ 10.) Furthermore, the other five tests described in the Summary Sheet fail to rebut the Government's evidence. Two of them were tainted with testing deficiencies and could not provide any "conclusive evidence to be used for further consideration" (Summary Sheet 3, Ex. 6 to Pl.'s Resp. & Reply.) The other three show no difference in insulative properties between the subject bags and a different bag regardless of the thickness or existence of a foam layer in the other bag. (Id. at 4–6.)

Nonetheless, based on an independent review of the data in the Summary Sheet, the court finds that the bags, even without the foam layer, still offer some degree of insulation.

---

[8] A.D. Sutton also contends that Customs' reference to the First Lab Report as "Preliminary Results" and reference to the Second Lab Report as "Final Results," and the proximity of the dates noted on both reports, are "highly suggestive" of "a blatant attempt to manufacture data." (Pl.'s Resp. & Reply 18–19.) These contentions are speculative.

[9] A.D. Sutton provided the court with a copy of the Summary Sheet.

Court No. 03-00510                                                                                         Page 15

Indeed, A.D. Sutton's expert witness stated that "any sealed container[] actually would provide some 'insulation.'" (Crain Report 11).  And the Government admitted that the bags insulate as well as a brown paper bag.  (Def.'s Statement of Undisputed Material Facts ¶ 8.)

## CONCLUSION

In sum, under Carborundum, the determination of the principal use of the bags involves determinations as to a subsidiary set of questions.  The Government attempted to answer some questions and Sutton others.  Although the Government's evidence tends to show that the foam layer is not capable of insulating to a great degree and thus the product may not be for food storage, its evidence also suggests that the bags may still offer some degree of insulation.  For its part, A.D. Sutton fails to show that the foam layer retards temperature change to a significant degree, but its evidence, while somewhat conclusory, indicates that the bags are actually sold for the purpose of storing food and beverages.  The evidence raises a genuine issue of material fact as to the principal use of the bags for classification purposes.[10]  The parties' motions for summary judgment are DENIED.

    /s/ Jane A. Restani
Jane A. Restani
Chief Judge

Dated: This 16th day of July, 2008.
    New York, New York.

---

[10] Because the Government's evidence fails to show conclusively that the bags are not suitable for food storage, and A.D. Sutton provides evidence of the intended use of the bag, the presumption of correctness applicable to Customs' factual determinations does not resolve the issue.

# NOTICE OF ENTRY AND SERVICE

    This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

    Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

    or

    Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

    Tina Potuto Kimble
    Clerk of the Court

Date: _____   By: _____
    Deputy Clerk